CUNO INCORPORATED, Plaintiff,

v.

PALL CORPORATION, Pall Ultrafine Filtration Corporation, Pall East Hills Manufacturing Corporation, and Pall Trinity Micro Corporation, Defendants.

No. 86–CV–3197.

United States District Court, E.D. New York.

Dec. 19, 1989.

See also 121 F.R.D. 198.

Clyde F. Willian, James B. Blanchard, John L. Cline, Steven Z. Szczepanski, James R. Sobieraj, Glen P. Belvis, Willian, Brinks, Olds, Hofer, Gilson & Lione, Chicago, Ill., for plaintiff.

C. Frederick Leydig, H. Michael Hartmann, Mark E. Phelps, John E. Rosenquist, Paul J. Korniczky, Leydig, Voit & Mayer, Chicago, Ill., for defendants.

WEINSTEIN, District Judge.

The production of microporous nylon membrane filters generates hundreds of millions of dollars in worldwide revenues. It is vital to pharmaceutical, microchip and other industries requiring filtration of impurities the size of the smallest microbes. Plaintiff Cuno and defendants Pall and its associated companies are major competitors in this field. They press claims and counterclaims relating to the validity, infringement and enforceability of a number of key patents teaching methods of producing these filters.

Defendants move for partial summary judgment based on the collateral estoppel effect of factual findings made by a Justice of the United Kingdom Court of Chancery, Patent Division, in a prior adjudication between the parties. The European Patent Office's counterpart of defendants' United States patent at issue here was there found to be valid and noninfringing. Defendants argue that the findings of fact made by the foreign court are entitled to preclusive effect since the patent issued by the European Patent Office on behalf of the countries of the European Economic Community describes the same technological invention and makes claims that are in all material ways identical to those contained in defendants' United States patent.

Plaintiff argues that the traditional requirements for granting collateral estoppel are not present here and that the application of preclusive effect to findings made by a foreign court runs counter to policies underlying both domestic and foreign patent law. For the reasons noted below, the court denies defendants' motion.

## I. Facts

At issue are six patents. Five of the patents—four of which are held by plaintiff—relate to the membrane filters themselves. One—also held by plaintiff—covers a process for producing microporous membrane filters. Closely analogous counterpart patents for the membranes have been issued to both plaintiff and defendants in a number of foreign countries.

In 1975 plaintiff Cuno was granted the first of the patents, U.S. Patent No. 3,876,-738, known after its inventor as the Marinaccio patent. The Marinaccio patent describes a process for producing membrane filters, in part by mixing nylon with a solvent and a nonsolvent and spreading the resultant liquid "dope solution" into sheet form under the surface of a quenching medium. Cuno did not utilize this process commercially to produce membranes—if it did so at all—until the early 1980's. Nor did plaintiff apply for any foreign counterpart patents for the Marinaccio process.

In the late 1970s defendants (referred to collectively as Pall) developed their own nylon membrane filters. Pall applied in 1978 for a patent from the United States Patent Office. The following year Pall applied for counterpart patents in approximately two dozen countries, primarily through the European Patent Office in Munich, Germany. Plaintiff opposed these foreign patent applications in the various patent offices. Opposition appears to have been largely unsuccessful. Defendants began to market their nylon membranes commercially in 1978. They were issued a patent, U.S. Patent No. 4,340,479—the Pall patent—in 1982. A counterpart, Pall's European Patent Convention (EPC) Patent No. 5,536, was issued in 1987. To date domestic sales of the Pall membrane have generated approximately $300 million in revenues, considerably more than the amount generated by plaintiff's products.

In the early 1980s Cuno developed and introduced a line of membrane filters, known as Zetapor membranes. Cuno claims that these membranes can be distinguished from those produced by defendants by virtue of the application of a coating and a charge-modifying agent, additions designed to enhance the removal of bacteria. Beginning in 1981, and for several years thereafter, Cuno applied for and was subsequently issued patents for its Zetapor membranes. These patents are known collectively as the Ostreicher patents, and four are at issue in this action: U.S. Patent Nos. 4,473,474, 4,673,504, 4,708,803 and 4,711,973. Cuno successfully

applied for counterpart patents in a number of foreign countries.

Pall developed and began to market its own charge-modified membranes in 1982, known as co-cast Posidyne membranes. Although the Posidyne membranes are not in suit here, plaintiff argues that they infringe its Ostreicher patents insofar as they do no more than modify the allegedly infringing basic Pall membrane.

In addition to opposing Pall's various patent applications abroad, Cuno brought the instant lawsuit in September of 1986. Plaintiff's complaint charged defendants' membranes with infringing two of the Cuno Ostreicher patents, U.S. Patent Nos. 4,473,474 and 4,673,504. In an amendment to the complaint a year later, Cuno charged that the Pall membrane also infringes the Marinaccio process patent, U.S. Patent No. 3,876,738. Cuno alleges that the 1975 Marinaccio patent claims disclosed Pall's later invention and thus constituted invalidating prior art both because they anticipated the Pall invention within the meaning of 35 U.S.C. § 102 and because plaintiff's invention rendered the Pall product obvious and therefore unpatentable under 35 U.S.C. § 103. Cuno also challenged the validity of Pall's patent, alleging that it had been anticipated by the prior public use at several companies of defendants' membranes over a year before Pall applied for a patent.

Pall counterclaimed for infringement of its U.S. Patent No. 4,340,479, and for a declaration that two additional Cuno Ostreicher patents, U.S. Patent Nos. 4,708,803 and 4,711,973, were invalid and not infringed by Pall's membrane. In response, Cuno counterclaimed for infringement of these remaining Ostreicher patents as well.

Briefly, the Marinaccio–Pall dispute focuses on the process by which the parties produce their respective membrane filters. Cuno asserts the Marinaccio process patent against claims made in the Pall patent, alleging that its earlier patent and the membranes produced by the Marinaccio process constitute invalidating prior art. Cuno also charges that Pall copied plaintiff's Marinaccio process without informing the United States Patent Office and subse-

quently responded to direct inquiries made in the early 1980's by Cuno's parent company by falsely denying use of an infringing process.

In response, Pall denies infringement, first on the grounds that its production process differs from plaintiff's since it involves two separate steps of casting and quenching, rather than the combined process disclosed in the Marinaccio process by which the dope solution is cast directly under the surface of the quenching medium. Second, defendants argue that the Marinaccio patent is invalid because it not only failed to produce a useful product as defined by 35 U.S.C. § 101, but also because the process it describes had in fact been abandoned by Cuno—a fact plaintiff allegedly concealed from the patent office—for some time before the patent was granted in 1975. *See* 35 U.S.C. § 102(c) (patent shall not be issued if applicant has abandoned the invention).

The Ostreicher–Pall claims and counterclaims relate to the charge-modified membranes produced by each of the parties. Cuno claims that Pall's Posidyne membranes infringe plaintiff's Ostreicher patents. Defendants counterclaim, alleging infringement insofar as Cuno's Zetapor membranes merely coat Pall's basic membrane. Defendants base this argument on the alleged invalidity of the Marinaccio patent, as well as on the ground that their own charge-modified membranes constitute invalidating prior art. Included in these claims are allegations and counterallegations of fraudulent failure to disclose information to the United States Patent Office.

While discovery was proceeding in the United States action, Pall initiated a lawsuit in Great Britain in 1987 against Cuno and two of its European subsidiaries, claiming that Cuno's Zetapor membranes infringed key claims made in Pall's newly-granted EPC patent. Discovery for the United States case was used in the British action. That case was tried in London for four weeks in the late spring and summer of 1989. Some of the testimony, and many of the witnesses from the British case are expected to be utilized in the upcoming United States trial.

On July 25, 1989 the British judge, Justice Falconer, ruled in Pall's favor, making extensive findings and construing critical terms in the claims made in Pall's EPC patent. In a 64–page opinion, he concluded, *inter alia,* 1) that Pall's patent was valid; 2) that Cuno's Zetapor membranes infringed claims in Pall's EPC patent; 3) that there was no merit to the anticipation defense raised by Cuno based on its United States Marinaccio patent; and 4) that there had been no invalidating prior public use when Pall utilized some of its filters in 1976 and 1977 in tests by prospective customers. An order enjoining Cuno from infringing the Pall EPC patent was entered on August 1, 1989. Shortly thereafter Cuno filed a notice of appeal.

Cuno continues to prosecute its opposition to the Pall EPC patent in the European Patent Office. It is unclear what, if any, effect a decision revoking or modifying Pall's EPC patent would have on the British court's ruling should Cuno's opposition prove successful. The court's order contained a "liberty to apply" provision, which apparently allows either party to return to the court to make further applications in the event that matters are elicited "concerning or arising out of [Cuno's] Opposition in the [European Patent Office]." In any event, the parties have informed the court that the European Patent Office may not render a decision for years.

This court originally ordered a jury trial to begin in September. As a result of the United Kingdom decision, the court tentatively suggested that collateral estoppel might permit shortening of the trial. It became apparent, however, that the procedural and technical problems associated with a motion for application of collateral estoppel on the basis of findings made in the English judgment were so difficult and required so much further briefing and argument that it would be impossible to start the jury trial as scheduled.

In support and opposition to the motion for partial summary judgment, several days of hearings were conducted at which

experts on patent and procedural law from the United States, the United Kingdom and Germany testified. Experts from both sides described the technology and development of a variety of patents in this field over the last 20 years. Extensive briefing and argument followed.

## II. Law

A motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate in a patent case. *Johnston v. Ivac Corp.*, 885 F.2d 1574, 1577 (Fed.Cir.1989) (citing the expansive view of power to grant summary judgment in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)); *Townsend Engineering Co. v. Hitec Co.*, 829 F.2d 1086, 1089 (Fed.Cir.1987) (" 'Summary judgment is as appropriate in a patent case as in any other' where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law.") (citations omitted); *Chemical Engineering Corp. v. Essef Industries*, 795 F.2d 1565, 1571 (Fed. Cir.1986) (threat of summary judgment in patent cases appropriate and often beneficial); *Barmag Barmer Maschinenfabrik A.G. v. Murata Machinery, Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984) (citing patent cases during prior year in which court granted summary judgment). *But cf. SRI International v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1116 (Fed.Cir.1985) ("summary judgment is ... a 'lethal weapon' capable of 'overkill.' ") (citation omitted).

■ The application of collateral estoppel to patent cases is similarly appropriate. *See, e.g., Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971) (collateral estopel applied to issue of validity of patent where patent was declared invalid in prior proceeding in which patentee had full and fair chance to litigate); *Hartley v. Mentor Corp.*, 869 F.2d 1469, 1471 (Fed.Cir.1989) ("Issue preclusion in patent litigation may arise under same conditions as in any litigation...."); *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 655 (Fed.Cir.1984)

(granting summary judgment on basis of collateral estoppel); *Mississippi Chemical Corp. v. Swift Agricultural Chemicals Corp.*, 717 F.2d 1374 (Fed.Cir.1983) (where no evidence existed that patentee had been deprived of full and fair opportunity to litigate in earlier case, it was appropriate to issue writ of mandamus ordering district court judge to grant summary judgment based on application of collateral estoppel to prior finding of invalidity).

Nevertheless, the Federal Circuit has shown a general antipathy to applying collateral estoppel as a basis for a judgment in circumstances arguably similar to those present in this case. *See, e.g., Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428–29 (Fed. Cir.1988) ("[A] court's decision upholding a patent's validity is not ordinarily binding on another challenge to the patent's validity ... in ... the courts....") (citation omitted); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed.Cir.1983) (in order to apply collateral estoppel to judicial statements in prior proceeding regarding scope of patent claims, such statements must be narrowly construed and must have been essential to final judgement on question of either validity or infringement). *Cf. Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1136 (Fed.Cir.1985) (denying summary judgment sought on collateral estoppel ground); *Young Engineers, Inc. v. United States International Trade Commission*, 721 F.2d 1305, 1316 (Fed.Cir.1983) (refusing to apply collateral estoppel); *Plastic Container Corp. v. Continental Plastics*, 607 F.2d 885, 894 (10th Cir.1979) ("[T]he public interest in upholding valid patents ... outweighs the public interest underlying collateral estoppel....").

■ Where the prior adjudication was by a foreign nation's court applying its patent law to its patents, the barriers to reliance on the foreign judgment for collateral estoppel purposes become almost insurmountable. Differences in the law of the two nations and in the detailed language of the patent are emphasized to avoid issue preclusion in a patent case pending in this country even where the invention, the technological and economic competition be-

tween the parties, and the consequences of the judgments are for all practical purposes the same. *See, e.g., Medtronic, Inc. v. Daig Corp.,* 789 F.2d 903, 907–08 (Fed. Cir.), *cert. denied,* 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986) (prior conclusion of German tribunal as to obviousness of counterpart German patent does not control issue of obviousness in action involving United States patent); *Stein Associates, Inc. v. Heat and Control, Inc.,* 748 F.2d 653 (Fed.Cir.1984) (denying motion to enjoin efforts to enforce British patent in Britain where U.S. counterpart patent had been deemed invalid) (citing cases); *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 278–85 (5th Cir.1974) (issue in United States of date of "reduction to practice" not the same as issue of "date of invention" decided in previous Canada case); *Ditto, Inc. v. Minnesota Mining & Manufacturing Co.,* 336 F.2d 67, 70–71 (8th Cir. 1964) (prior adjudication in which West German Federal Patent Court found German counterpart patent invalid is not controlling authority); *Baracuda International Corp. v. F.N.D. Enterprises, Inc.,* 222 U.S.P.Q. 134, 135 (S.D.Fla.1982) ("The South African courts' judgments are, of course, not binding upon our own where patent validity is at issue."). As Chief Judge Markey remarked in *Stein Associates v. Heat and Control, Inc.,* 748 F.2d 653 (Fed.Cir.1984):

> British law being different from our own, and British and United States courts being independent of each other, resolution of the question of whether the United States patents are valid could have no binding effect on the British court's decision.

*Id.* at 658. The converse is equally true.

Even if this court were to apply collateral estoppel to certain factual findings made by the British court—as opposed to importing its legal conclusions wholesale—it is not clear that trial time would be significantly shortened. Furthermore, the Federal Circuit's reluctance to give collateral estoppel effect to foreign judgments would seem to apply here to foreign findings of fact insofar as those findings involve mixed questions of fact and foreign law.

It is a quiddity of our law that a well and thoroughly reasoned decision reached by a highly skilled and scientifically informed justice of the Patent Court, Chancery Division, in the High Court of Justice of Great Britain after four weeks of trial must be ignored and essentially the same issues with the same evidence must now be retried by American jurors with no background in science or patents, whose average formal education will be no more than high school. This curious event is the result of the world's chauvinistic view of patents.

The law's absurdity as revealed by this case lends force to recommendations for a universal patent system that recognizes that ours is a worldwide technological and economic community. *See, e.g.,* Note, *International Patent Cooperation: The Next Step,* 16 Cornell Int'l L.J. 229, 248–49, 252–68 (1983) (recommending unified international patent law); Beir, *The European Patent System,* Vand. J. Transnat'l L. 1, 14–15 (1981) (recommending greater cooperation along lines of European system). Obviously there are grave difficulties in devising a system that will not disadvantage the old fashioned single craftsman-inventor or citizens of countries with patent offices that are careful in investigating before issuing patents. But the European Patent Office furnishes a model that appears to be working. Perhaps paragraph (1) of Article 4$^{bis}$ of the Paris Convention, with its emphasis on nationality, needs to be reconsidered. It reads:

> (1) Patents applied for in the various countries of the Union by nationals of countries of the Union shall be independent of patents obtained for the same invention in other countries, whether members of the Union or not.

Convention of Paris for the Protection of Industrial Property, article 4$^{bis}$(1), 21 U.S.T. 1583, 1635, T.I.A.S. No. 6923 (text), 24 U.S.T. 2140, T.I.A.S. No. 7727 (ratification).

There would appear to be no constitutional inhibition against a reconsideration of

international patent policy. Clause 8 of Article I of the Constitution grants Congress power over patents. But, just as Congress delegates much of its patenting power to the patent office and the courts, the government may, under Article II, section 2, clause 2 of the Constitution, provide a role for international bodies through the treaty making powers. *See, e.g.,* 39 U.S.C. § 407a (authorizing Postal Service, with consent of President, to negotiate and conclude postal treaties or conventions); Universal Postal Union, 16 U.S.T. 1291, T.I. A.S. 5881 (international treaty ratified and approved by United States Postmaster, approved by President). *Cf.* Casad, *Issue Preclusion and Foreign Country Judgments: Whose Law?,* 70 Iowa L.Rev. 53, 79–80 (1984) (suggesting treaty or exercise of federal common law power of Supreme Court to resolve issues of recognizing and enforcing foreign judgments).

### III. Other Grounds for Summary Judgment

As an alternative ground for summary judgment the court could rely on the evidence produced on the motion for summary judgment. It includes extensive affidavits, testimony before this court of scientific and legal experts, the transcript of the trial in Great Britain, patent files and extensive materials for judicial notice. Taken together this mass of evidence still depends somewhat on evaluation of the credibility of prospective witnesses. The issue must be left for the jury.

Should the jury decide in a way inconsistent with the United Kingdom court's decision or the record, the court could, after the trial, grant what would be in effect a delayed summary judgment motion. *See County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387, 1393 (E.D.N.Y. 1989) (citing *DeRosa v. Remington Arms Co.,* 509 F.Supp. 762 (E.D.N.Y.1981)).

### IV. Conclusion

The motion for summary judgment is denied. Plaintiff will be allowed twenty trial days to complete its case. Defendant will be allowed fourteen trial days. There will be one day for rebuttal. Trial will commence on February 26, 1990. The court does not believe that an immediate appeal from this order may materially advance the ultimate termination of the litigation.

So ordered.